IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JUNE GIPSON**                                    Case No. 5:16 CV 1108

    Plaintiff,

    v.                                         Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                 MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff June Gipson ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consent to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB on August 6, 2013, alleging a disability onset date of July 16, 2007. (Tr. 173). Plaintiff's date last insured for DIB was December 31, 2011. (Tr. 192). Plaintiff's DIB claim was denied initially (Tr. 113) and upon reconsideration (Tr. 125). On January 2, 2014, Plaintiff filed a Request for Hearing. (Tr. 130-31). Thereafter, on May 12, 2015, Plaintiff (represented by counsel) appeared before an Administrative Law Judge ("ALJ"). (Tr. 36-87). The ALJ denied Plaintiff's application for DIB, finding that from the alleged onset date to the date last insured, Plaintiff was capable of performing a reduced range of light work. (Tr. 23). The Appeals

Council denied Plaintiff's request for a review of the ALJ's decision, making it the final decision of the Commissioner. (Tr. 1). On May 10, 2016, Plaintiff filed the instant action for judicial review pursuant to 42 U.S.C. § 405(g). (Doc. 1).

FACTUAL BACKGROUND

Plaintiff was born on August 6, 1957, and was fifty-seven years old at the time of the administrative hearing. (Tr. 88). Plaintiff was married, had two adult children, a high school degree, and a driver's license. (Tr. 41, 43, 56). For eighteen years, Plaintiff worked for Coltene-Whaledent, employed as a machine and hand packager, general inspector, compounder, and store laborer. (Tr. 45-49, 72-73).

*Medical Evidence*

<u>Treatment Records Prior to Date Last Insured</u>

*Physical Impairments*

Dr. Atul Goswami had been Plaintiff's treating physician since 2001. (Tr. 277). Dr. Goswami noted that, in May 2006, Plaintiff reported pain in both upper extremities, as well as numbness and tingling in both upper extremities, her hands, and fingers. *Id.* In December 2006, Dr. Goswami ordered an MRI of Plaintiff's cervical spine that revealed mild relative congenital central canal stenosis throughout the cervical spine due to congenitally short pedicles. (Tr. 285). In addition, the MRI revealed mild multilevel cervical degenerative disc disease with multilevel central canal stenosis that was moderate at the C5-C6 and C6-C7 levels. *Id.* There was focal endplate osteophyte formation versus a small broad based left paracentral disc protrusion at the C6-C7 level. *Id.* Furthermore, Dr. Goswami noted a probable small disc protrusion at C7-T1, causing only mild central canal stenosis but no cord deformity, and a possible, but very mild neural foraminal narrowing at the C6-C7 level. *Id.* Thereafter, Plaintiff saw Dr. Georges Markarian, a

neurosurgeon, who diagnosed Plaintiff with herniated discs at C5-C6 and C6-C7. (Tr. 286). As a result, Dr. Markarian performed partial C5, C6, and C7 corpectomies, arthrodesis at C5-C6 and C6-C7, inserted biomedically threaded bone dowels at C5-C6 and C6-C7, and plating from C5 through C7. *Id.*

Plaintiff began physical therapy on April 26, 2007. (Tr. 324). The treatment goals were to: 1) return Plaintiff to a 10/10 activity level and to be able to hold her grandchild; 2) return her range of motion to normal; and 3) be able to walk for exercise. *Id.* Plaintiff completed physical therapy on July 3, 2007, attaining her treatment goals. (Tr. 331).

In June 2007, Dr. Goswami completed a form regarding Plaintiff's symptoms and treatment after her neck surgery. (Tr. 277-78). He noted that Plaintiff had a "good response" to surgery, but she still had some pain. (Tr. 278). Dr. Goswami said Plaintiff could sit okay, and stand and walk better. *Id.* However, he said she was unable to bend, stoop, lift, or grasp. *Id.*

On July 12, 2007, Plaintiff returned to Dr. Markarian for post-surgical evaluation. (Tr. 281). She said she was doing very well, and Dr. Markarian noted no obvious neurological deficits. *Id.* Thereafter, on July 20, 2007, Dr. Markarian reexamined Plaintiff who again stated she was doing well and had no specific complaints. (Tr. 280). Dr. Markarian noted Plaintiff's back looked good and the bone graft was starting to fuse. *Id.* He also remarked that there was a gap that would have to be closely followed. *Id.* However, Dr. Markarian did not identify any complications. (Tr. 282).

Plaintiff went to the emergency room on February 17, 2011, for a urinary tract infection. (Tr. 301). She did not have any pain on palpitation in the cervical, thoracic, or lumbar spine. (Tr. 303). The hospital discharged Plaintiff approximately 12 hours later. *Id.*

*Mental Impairments*

Plaintiff received mental health care at the Center for Akron Psychiatry in 2006 and 2007 with Dr. Todd Ivan. (Tr. 259-74). Dr. Ivan diagnosed Plaintiff with major depression and panic disorder and prescribed Pamelor and Xanax. (Tr. 273-74). However, by June 2007, Dr. Ivan said Plaintiff's condition had improved, indicating: no depression; only mild anxiety; cooperative demeanor; good eye contact; normal activity; logical and goal-directed thought processes and content; good judgment and insight; intact memory; good attention and concentration; and full and appropriate affect. (Tr. 259).

On the evening of October 14, 2009, Plaintiff went to the emergency room with reports of hallucinations starting the day before. (Tr. 314). Plaintiff's husband had left her five days prior to the start of her hallucinations. *Id.* The examining physician observed Plaintiff was alert, oriented, pleasant, conversational, with normal speech, range of motion, and affect. (Tr. 315). The diagnostic impression was acute psychosis versus acute stress reaction versus depression. *Id.* The hospital discharged Plaintiff four hours later on October 15, 2009. *Id.*

Medical Records After Date Last Insured

*Physical Impairments*

Plaintiff visited Dr. Goswami on March 14, 2013, complaining of a painful cough with greenish mucus. (Tr. 373). She did not complain of any back or neck pain. *Id.*

Plaintiff went to the emergency room on April 12, 2013, complaining of back and left shoulder pain starting a couple of days prior. (Tr. 293). Plaintiff reported some numbness and difficulty moving her left arm. *Id.* Plaintiff received pain medication and instructions to follow up with her primary care physician and neurosurgeon. (Tr. 294).

On April 22, 2013, Dr. Goswami diagnosed Plaintiff with cervical and lumbar radiculopathy; however, he noted her musculoskeletal, neurologic, and psychiatric examinations were normal. (Tr. 369-72). On April 25, 2013, Dr. Goswami ordered an MRI of Plaintiff's cervical spine that revealed postsurgical changes of the C5-C6 and C6-C7 levels as well as C4-C5 mild canal stenosis with mild diffuse disk bulging. (Tr. 289). Dr. Goswami also ordered an MRI of her lumbar spine that showed only minimal disk bulging at the L1-L2 level without central canal stenosis. (Tr. 290).

On referral from Dr. Goswami, Plaintiff saw Shelly Krampf, a physical therapist, on May 15, 2013, to reduce her neck and lower back pain. (Tr. 375). Plaintiff reported her neck pain had increased five weeks prior, and her lower back pain had increased over the past year. *Id.* Plaintiff had a reduced range of motion in her trunk and cervical spine. *Id.* Ms. Krampf noted Plaintiff was able to walk with no acute distress; however, she had a lateral shift to the right. *Id.* Ms. Krampf observed Plaintiff's "upper extremity range of motion [was] within normal limits." *Id.* She also observed Plaintiff's "foot and ankle motions are within normal limits." *Id.* Plaintiff's "side bending and rotation right and left [were] within functional limits" and her "lower extremity range of motion [was] within functional limits." *Id.*

Dr. Goswami supplied a medical source opinion on September 21, 2013. (Tr. 384). He opined Plaintiff could occasionally carry five pounds and frequently carry two pounds; could stand and walk for 30 minutes at a time, for a total of two hours; and could sit for ten hours without interruption and for three hours total during an eight-hour workday.[1] (Tr. 383). He also opined that

---

1. Dr. Goswami's notation is unclear. In Dr. Goswami's other entries regarding standing and sitting he used hash marks to indicate minutes (rather than hours). (Tr. 383). However, in responding to how many hours Plaintiff could sit total, and without interruption, he wrote "3'" and "10", respectively. *Id.* As written, it is unclear, as it seems to indicate Plaintiff was capable of sitting without interruption for longer than he was capable of sitting in total.

Plaintiff could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push, pull, or use fine or gross manipulation. *Id.* Dr. Goswami opined that Plaintiff's pain would interfere with her concentration, cause her to be off task, and cause absenteeism. (Tr. 384). Lastly, he opined that Plaintiff would need six unscheduled breaks during the workday. *Id.*

On October 1, 2013, Dr. Goswami indicated Plaintiff continued to have pain in the lumbar and cervical regions, but the pain did not cause any motor loss. (Tr. 368). Dr. Goswami observed Plaintiff's range of motion was limited in the lumbar region. *Id.* In contrast to his September 21, 2013 opinion, he opined that Plaintiff could perform fine and gross manipulation. *Id.* He also noted Plaintiff's gait was slow, but an ambulatory aid was not medically necessary. *Id.*

In a February 2014 emergency room visit, Plaintiff reported increased neck pain after lifting a heavy bag of dog food. (Tr. 398, 423). She returned to physical therapy on March 26, 2014, reporting increased neck pain over the last month or two. (Tr. 397). At that visit, Plaintiff also stated her lower back pain had been occurring for the last "2 years this time." (Tr. 414). On July 30, 2014, Plaintiff's physical therapist discharged her from physical therapy with no improvement in her neck or back pain. (Tr. 493).

On August 8, 2014, Plaintiff saw an orthopedist who observed a limited range of motion in her neck and recommended Plaintiff continue physical therapy and see Dr. Markarian. (Tr. 423-24). On November 26, 2014, Plaintiff received a lumbar epidural injection, which lowered her pain. (Tr. 465). X-Rays of Plaintiff's spine, taken on December 29, 2014, showed no fractures or subluxations, well-preserved disc spaces, minimal anterior osteophyte formation at L3 and L4, and only minimal degenerative changes at the L4-5 and L5-S1 facet joints. (Tr. 464).

On April 16, 2015, Dr. Goswami opined Plaintiff could lift five pounds frequently, was limited to standing for ten minutes at a time and for a total of one hour during the workday, and

limited to sitting for 30 minutes[2] at a time and two hours total during the workday. (Tr. 543). Furthermore, he opined that Plaintiff could rarely climb, balance, stoop, crouch, kneel, crawl, reach, or push. (Tr. 543-44). However, he was of the opinion that Plaintiff could occasionally perform fine manipulation. (Tr. 544). He characterized Plaintiff's pain as moderate, and submitted her pain would interfere with her concentration, take her off task, and cause absenteeism. *Id.* Dr. Goswami opined that Plaintiff's limitations were caused by cervical and lumbar spinal stenosis. (Tr. 543-44).

*Mental Impairments*

On May 21, 2013, Dr. Ivan reported Plaintiff had a cooperative demeanor, normal activity, and good eye contact. (Tr. 361). She had a normal speech rate, was coherent, and spontaneous. *Id.* She exhibited good judgment, insight, concentration, full and appropriate affect, intact memory, and no anxiety or hallucinations. *Id.* However, Dr. Ivan noted Plaintiff still suffered from mild depression. *Id.* Dr. Ivan continued her medications at the same dosages. (Tr. 363).

Subsequently, on July 16, 2013, Dr. Ivan observed Plaintiff was responding well to her treatment and her condition had improved. (Tr. 364-65). Additionally, he reported Plaintiff was responding well to physical therapy for her back and neck. (Tr. 364). Dr. Ivan stated Plaintiff had: a cooperative demeanor; normal activity; good eye contact; normal speech rate; a full and appropriate affect; a normal thought process and content; good judgment and insight; good attention and concentration; and an intact memory. *Id.*

---

2. Again, Dr. Goswami's notation is unclear. When asked how long Plaintiff could stand or walk, Dr. Goswami wrote "1⁰" and "10 min", respectively. (Tr. 543). However, in responding to how long Plaintiff could sit in total, and without interruption, he wrote "2⁰" and "30", respectively. *Id.* As written, it is confusing because Dr. Goswami seems to be indicating that Plaintiff could sit without interruption longer than she could sit in total.

On October 17, 2013, Dr. Ivan reported to Disability Determination Services that Plaintiff had poor concentration and was "flighty." (Tr. 357). He also noted she had a depressed and anxious mood and that she was frequently nervous and avoided other people as a result. *Id.* He opined that Plaintiff was overly dramatic with her peers, coworkers, and supervisor interactions. *Id.* Dr. Ivan said Plaintiff had been continuously ill for six months and intermittently ill for the last five years. *Id.* He also said Plaintiff was responding poorly to her medications, had a poor tolerance of stress, and her anxiety limited her ability to complete a normal workweek. (Tr. 358).

Dr. Ivan also completed a medical source statement of Plaintiff's mental capacity.[3] (Tr. 360). He opined Plaintiff could: occasionally maintain attention and concentration for extended periods of two-hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to coworkers; and interact with supervisors. *Id.* In conjunction, Dr. Ivan noted Plaintiff could only occasionally: work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* However, Dr. Ivan also opined that Plaintiff could constantly follow work rules, use judgment, and function independently without redirection. *Id.*

On October 23, 2013, state agency psychologist Dr. Paul Tangeman reviewed Plaintiff's records. (Tr. 93-97). He opined that Plaintiff was moderately limited in her ability to: 1) maintain concentration and attention; 2) complete a normal workday and workweek without interruptions; 3) interact appropriately with the general public; 4) and accept instructions and respond

---

3. This medical source statement was neither signed nor dated. (Tr. 360). However, it was included with Dr. Ivan's treatment records dated May 21, 2013 through July 16, 2013. (Tr. 360-65).

appropriately to criticisms from supervisors. (Tr. 96). He also observed Plaintiff was moderately limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting. (Tr. 96-97). Dr. Mel Zwissler affirmed Dr. Tangeman's assessment on December 8, 2013. (Tr. 108-10).

Plaintiff returned to Dr. Ivan on January 16, 2014. (Tr. 436). In his notes, Dr. Ivan stated Plaintiff was seeking disability for arthritis in her neck and noted Plaintiff had stopped taking Seroquel because she said she did not need it anymore. *Id.* Dr. Ivan observed Plaintiff had a cooperative demeanor; normal activity; good eye contact; normal, coherent, and spontaneous speech; full and appropriate affect; good judgment and insight; good attention and concentration; and intact memory. *Id.* He also reported Plaintiff's depression and anxiety were mild and effectively controlled by medication. *Id.* Dr. Ivan opined that Plaintiff was responding well to treatment. *Id.*

Plaintiff's next appointment with Dr. Ivan was on August 25, 2014. (Tr. 433). Again, Dr. Ivan observed Plaintiff had a cooperative demeanor; normal activity; good eye contact; normal, coherent, and spontaneous speech; affect full and appropriate; good judgment and insight; and good attention and concentration. (Tr. 434). He noted a "partial" response to treatment and her prognosis was good. *Id.* Plaintiff returned on September 29, 2014. (Tr. 431). Dr. Ivan observed Plaintiff's demeanor was cooperative; activity was normal; eye contact was good; coherent, spontaneous, and normal rate of speech; full and appropriate affect; normal thought processes; good attention and concentration; and intact memory. *Id.*

***ALJ Hearing***

*Plaintiff's Testimony*

At the administrative hearing, Plaintiff testified she left her job because of neck and back pain. (Tr. 51). She later tried working as a cashier at Target, but had to leave because of pain. (Tr. 44). She maintained she could not work anymore because of continuing pain on her left side. (Tr. 52). She testified she could lift her arm to chest height; but she said the pain was constant and she was taking pain medication. *Id.* She rated her pain level to be an eight out of ten. *Id.* Plaintiff testified the pain radiated from her left shoulder down to her left side. (Tr. 53). She also testified her left hand shook because of her neck, but she had not seen a doctor about it because it had just started. (Tr. 58). Plaintiff said she had sleeping issues. (Tr. 54). She stated she did not have mood swings because of her medication, but she had panic attacks once a month. *Id.* In addition, she would get nervous around people. (Tr. 55).

Plaintiff testified that she could not run a sweeper or mop floors. (Tr. 53). However, Plaintiff could cook dinner and dust. (Tr. 54). She could do the laundry if her husband carried it up and down the stairs. (Tr. 59). Plaintiff was also able to bathe herself. *Id.*

Plaintiff testified that on a typical day she would let her dog out, conduct exercises for her back, make herself breakfast, watch television, make dinner for her husband, and go to the grocery store. (Tr. 55). She went to church every week; services would last for an hour or so. (Tr. 57). On the other hand, Plaintiff maintained she did not go to the movies, because she could not sit for the duration of a film. *Id.* Plaintiff would go out to eat once every other week. *Id.* She also said she could not walk around the neighborhood, but was able to walk a couple of blocks. (Tr. 57-58). In addition, Plaintiff testified that she could sit for a half an hour and stand for a half an hour. (Tr.

58). Plaintiff said she loved reading, and when she would read or start a task, she was able to concentrate. (Tr. 59).

*VE Testimony*

The ALJ asked the vocational expert ("VE"), Bruce Holderead, to consider a hypothetical individual the same age, education, and work experience as the claimant who could: 1) occasionally lift up to twenty pounds; 2) frequently carry up to ten pounds; 3) stand and walk for six hours and sit up to six hours in an eight hour work day with normal breaks; 4) occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolding; 5) frequently balance, stoop, kneel, crouch, crawl; and 6) frequently handle, finger, and feel with the right hand. (Tr. 77). The individual could never have exposure to unprotected heights and would be limited to frequent exposure to moving mechanical parts. *Id.* The individual would be limited to simple, routine, repetitive tasks, but not at a production rate pace. *Id.* Further, the individual would be limited to simple work related decisions and could have frequent interaction with coworkers, the public, and supervisors. *Id.* The VE testified that such an individual could not perform Plaintiff's past relevant work. *Id.* However, the VE said there would be jobs available in the national economy such as a cleaner, housekeeper, sales attendant, and marker. (Tr. 78).

The second hypothetical mirrored the first, except the individual was also limited to no over the shoulder interaction with supervisors and occasional interaction with coworkers and the public. (Tr. 79). The VE responded that such an individual would still be able to perform the jobs previously identified. (Tr. 79-80).

The ALJ's third hypothetical assumed the same facts as hypotheticals one and two, and added a limitation to changing positions once an hour between sitting and standing without any

time off-task. (Tr. 80). The VE testified that such an individual could perform work as a cleaner, housekeeper, marker, and mail clerk. *Id.*

The fourth hypothetical assumed the same individual as hypotheticals one through three, except the ALJ modified the physical restrictions to occasionally lifting up to ten pounds, standing and walking for about four hours, and sitting for up to six hours in an eight-hour work day with normal breaks. (Tr. 81-82). The VE testified such an individual would be restricted to work at the sedentary level; but such an individual could work as an addresser, film touch-up, and document preparer. (Tr. 83).

The ALJ's fifth hypothetical assumed the same restrictions as in hypotheticals one through three, except the individual would be on task 85 percent of the time and off task 15 percent of the time. (Tr. 84). The VE said that in his professional opinion, there were not any jobs such an individual could perform. *Id.*

Additionally, when questioned by Plaintiff's attorney, the VE testified that at the sedentary level, Plaintiff did not have any skills that would be transferrable to other jobs. (Tr. 84). Plaintiff's attorney also asked the VE if, based on the restrictions recommended by Dr. Goswami, an individual of Plaintiff's age, education, and work history who was limited to lifting up to five pounds, occasionally standing and walking a total of two hours in an eight hour day, and sitting a total of three hours in a work day could perform any work. (Tr. 85). The VE responded there would not be any work available, nor would there be any work available for an individual who was absent two days a month. *Id.*

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant evidence as a reasonable mind might accept was adequate to support a conclusion." *Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for disability benefits is grounded upon the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).The Commissioner follows a five-step evaluation process to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe" which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his [or her] residual functional capacity, age, education, and work experience?

*Martinez v. Comm'r of Soc. Sec.*, 692 F. Supp. 2d 822, 825 (N.D. Ohio 2010); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v). Under this sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises three contentions with the ALJ's decision: 1) the ALJ erred in giving little weight to Dr. Goswami's opinions; 2) the ALJ failed to give good reasons for assigning little weight to Dr. Ivan's opinions; and 3) the ALJ erred in her evaluation and assessment of the state agency psychologists' opinions. (Doc. 15, at 13, 17, 19). The Commissioner responds that the ALJ properly assessed all of the opinion evidence. (Doc. 18, at 10, 13, 15).

### *Consideration of Dr. Goswami's Opinions*

Plaintiff contends the ALJ erred in assigning significant weight to portions of Dr. Goswami's opinions while assigning little weight to others. (Doc. 15, at 15). Specifically, Plaintiff challenges the weight given to Dr. Goswami's 2007 and 2013 opinions. *Id.* at 15-17. The Commissioner responds that the ALJ properly considered Dr. Goswami's 2007 and 2013 opinions by assigning those that were consistent with the treatment records significant weight and those that were inconsistent insignificant weight. (Doc. 18, at 10).

Medical opinions are evaluated under the factors set forth in 20 C.F.R. § 404.1527(c). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). Opinions from medical sources who have examined claimants are given more weight than sources who have not performed examinations ("nonexamining sources"). 20 C.F.R. § 404.1527(c)(1). Opinions from medical sources who regularly treat the claimants ("treating sources") are afforded more weight than those from sources who have examined the claimant but do not have an ongoing treatment relationship ("nontreating sources"). 20 C.F.R. § 404.1527(c)(2). In conjunction, the ALJ considers the supportability, consistency, and specialization of the physician. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); 20 C.F.R. § 404.1527(c)(3)-(6). "In other words, 'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2).

In general, "greater deference is [] given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). "Treating-source opinions must be given controlling weight if two conditions are met: 1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques;' and 2) the opinion 'is not inconsistent with the other substantial evidence in the record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). If the Commissioner does not assign controlling weight to a treating source opinion, "then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, [] as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must give "good

reasons" for the weight given to a treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) (finding ALJ gave good reasons for discounting parts of a treating physician's opinion). "These reasons must be 'supported by the evidence in the case record.'" *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *5). For example, a good reason is if a treating source's opinion is inconsistent with the rest of the evidence. *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1529(c)(4); *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 837 (6th Cir. 2016) (ALJ's reliance on a report not consistent with the record as a whole was misplaced). Accordingly, "[a]ny record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

An ALJ may consider also other factors in evaluating the credibility of a claimant's assertions. For example, an ALJ can consider the claimant's response to medication and her daily activities. *Walters*, 127 F.3d at 531 ("The regulations indicate that if disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (factors include daily activities). "In so doing, the Commissioner has the power

and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Walters*, 127 F.3d at 531. Although Plaintiff's response to medication and daily activities are not dispositive as to whether or not a claimant can actually work, *Cunningham v. Astrue*, 2008 WL 9463972, *14 (N.D. Ohio), they can either support or contradict a claimant's allegations. *Compare Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (claimant's daily activities supported allegations regarding pain), *with Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 544 (6th Cir. 2007) (claimant was able to perform a variety of daily activities which contradicted her subjective complaints).

### *Dr. Goswami's 2007 Opinion*

On June 12, 2007, Dr. Goswami conducted a post-surgical evaluation of Plaintiff in which he opined that Plaintiff could sit, stand, and walk but could not bend, stoop, lift, or grasp; however, he remarked that Plaintiff was responding well to the surgery. (Tr. 278). On July 12, 2007, Plaintiff followed up with Dr. Markarian. (Tr. 281). Dr. Markarian reported Plaintiff had said she was doing well, was lifting her grandchild, and opined she had fully recovered. *Id.* He reiterated this on July 20, 2007 and noted Plaintiff had "no specific complaints." (Tr. 280).

In her decision, the ALJ considered and weighed this opinion. (Tr. 27-28). The ALJ gave weight to some of Dr. Goswami's functional restrictions and little weight to others. *Id.* The ALJ gave weight to Dr. Goswami's June 2007 observations that Plaintiff could stand and walk better. *Id.* (citing Tr. 275-78). However, the ALJ gave little weight to Dr. Goswami's opinion that Plaintiff could not bend, stoop, lift, or grasp after her surgery. (Tr. 28). She noted Dr. Goswami's opinion contradicted Dr. Markarian's postsurgical observations of Plaintiff, and Dr. Goswami's opinion was made only sixty days after Plaintiff's fusion procedure. *Id.*

As portions of Dr. Goswami's June 2007 opinion stand in contrast to Plaintiff's post-surgical evaluations by Dr. Markarian, the undersigned finds the ALJ reasonably assigned those portions of Dr. Goswami's opinion little weight. 20 C.F.R. § 404.1527(c)(4) (the more consistent an opinion is with the record as a whole, the more weight it is assigned); SSR 96-2p, 1996 WL 374188 ("Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record."); *see also Bass v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007) (ALJ provided good reasons when noting the treating physician's findings were inconsistent with previous statements and contradicted by substantial evidence in the record).

Plaintiff additionally argues the fact she lifted her grandchild does not provide a good reason for giving little weight to Dr. Goswami's opinion, stating the intermittent performance of daily activities is not indicative that a claimant's symptoms are not disabling. (Doc. 15, at 15) (citing *Rogers*, 486 F.3d at 248). However, in the instant case, the ALJ used Plaintiff's assertions to Dr. Markarian to assign weight to Dr. Goswami's observations; the ALJ did not make a determination as to whether or not Plaintiff was actually disabled based on Plaintiff's lifting of her grandchild. (Tr. 28). Under the regulations, an ALJ may consider a claimant's daily activities and resolve conflicts in the record when disabling severity cannot be shown by objective medical evidence alone. *Walters*, 127 F.3d at 531; *see* 20 C.F.R. § 404.1529(c)(3).

The undersigned therefore finds no error in the ALJ's treatment of Dr. Goswami's 2007 opinion.

### Dr. Goswami's 2013 Opinion

Additionally, Plaintiff challenges the weight given to Dr. Goswami's September 2013 medical source opinion. (Doc. 15, at 15-17). Dr. Goswami authored this opinion on September 21,

2013, almost two years after Plaintiff's date last insured, December 31, 2011. (Tr. 384). Plaintiff posits her cervical disorder has existed since 2006 and that Dr. Goswami's September 2013 medical source opinion is consistent with his 2007 findings that Plaintiff could not bend, stoop, lift, and grasp. (Doc. 15, at 16). The Commissioner responds that the ALJ appropriately discounted Dr. Goswami's 2013 opinion because it post-dates Plaintiff's date last insured by over two years, and therefore, has little probative value. (Doc. 18, at 11-13).

Plaintiff argues medical evidence post-dating a claimant's date last insured may be probative of her condition prior to the expiration of her insured status. (Doc. 15, at 17) (citing *Ellis v. Schweiker*, 739 F.2d 245, 247 (6th Cir. 1984) and *Begley v. Matthews*, 544 F.2d 1345, 1354 (6th Cir. 1976)).

In evaluating a claimant's RFC, "evidence of disability obtained after expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004); *see also Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 506 (6th Cir. 2013) (treating physician's opinions offered after date last insured were not entitled to significant weight); *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n.6 (6th Cir. 1988) (testimony pertained mainly to claimant's condition after commitment, and therefore, shed little light on claimant's condition). However, a treating physician's opinion given after the date last insured "may be considered to the extent it illuminates [a claimant's] health before the expiration of her insured status." *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (6th Cir. 1999). On the other hand, such a retrospective opinion must be supported by relevant, objective evidence during the relevant period. *See Strong*, 88 F. App'x at 845; *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994); 20 C.F.R. § 404.1527(d)(2)-(3).

In her opinion, the ALJ observed that as of July 20, 2007, Plaintiff was doing well. (Tr. 25). The ALJ noted that other than Plaintiff's two emergency room visits on October 14, 2009 and February 17, 2011, "there [was] no evidence of any further medical, psychological, psychiatric, or any other treatment" from July 20, 2007 through December 31, 2011. (Tr. 25-26) (citing Tr. 288-354). The ALJ found "the 2013 opinions of Dr. Goswami . . . reference a lumbar impairment not diagnosed until 2013, rendering these opinions of little probative value in determining the claimant's functional capacity for work from 2007 through 2011." (Tr. 28) (citing Tr. 366-80, 383-84).

The record supports the ALJ's conclusion. Dr. Goswami's 2013 opinion, even applied retroactively, is not supported by relevant, objective evidence. His September 2013 opinion stated that his medical findings regarding Plaintiff's restrictions were due to Plaintiff's cervical and lumbar strains. (Tr. 383). Dr. Goswami did not diagnose Plaintiff with lumbar radiculopathy until April 22, 2013. (Tr. 372). Moreover, Plaintiff had visited Dr. Goswami on March 14, 2013, and indicated no back or neck pain. (Tr. 373). As of July 20, 2007, Plaintiff was doing well. (Tr. 280-81). Other than her two emergency room visits, there is no medical evidence in the record indicating Plaintiff's lumbar disorder predates her diagnosis in April 2013. Plaintiff additionally sought no treatment for her neck during this time period.

Moreover, there is evidence in the record to support that her condition began well after her date last insured, December 31, 2011. *See, e.g.*, (Tr. 293) (Plaintiff's April 12, 2013 emergency room visit complaining of left shoulder pain over the last couple of days); (Tr. 375) (Plaintiff's May 15, 2013 statement at physical therapy session that lower back pain had increased over the last year); (Tr. 378) (Plaintiff's April 12, 2013 report of shoulder pain for the past few days); (Tr. 397) (Plaintiff's March 2014 reported flare up of back pain starting around November 2013); (Tr.

401) (Plaintiff's report of pain since June 11, 2014); (Tr. 414) (Plaintiff's March 26, 2014 statement that her current condition has existed for the last two years). Furthermore, Plaintiff did not complain about any back or neck pain at her March 14, 2013 visit to Dr. Goswami. (Tr. 373). Therefore, given the fact that Dr. Goswami's 2013 medical opinion post-dated Plaintiff's surgery by almost two years and lacks any support from relevant, objective evidence from the alleged onset date through the date last insured, the ALJ reasonably determined they had little probative value in determining Plaintiff's residual functional capacity from 2007 through 2011. *See Johnson*, 535 F. App'x at 506; *Strong*, 88 F. App'x at 845; *Cornette*, 869 F.2d at 264 n.6.

### *Consideration of Dr. Ivan's Opinion*

Plaintiff also challenges the weight given to the opinions of her treating psychiatrist, Dr. Ivan. (Doc. 15, at 17). Specifically, Plaintiff argues the ALJ ignored Dr. Ivan's treating physician status and the consistency and applicability of his opinions regarding Plaintiff's condition between the onset date and her date last insured. *Id.* The Commissioner contends the ALJ properly discounted the portions of Dr. Ivan's opinion that were inconsistent with his own treatment notes and reasonably credited the portions that were consistent with the record. (Doc. 18, at 15).

On October 17, 2013, Dr. Ivan reported Plaintiff "had been continuously ill for six months and intermittently ill for the last five years." (Tr. 357). He also stated her anxiety limited her ability to complete a normal workweek. (Tr. 358). However, Dr. Ivan opined that there were no restrictions on Plaintiff's daily activities. (Tr. 357). Included with Dr. Ivan's notes was an undated medical source statement regarding Plaintiff's mental capacity, which stated Plaintiff had limitations with her concentration and ability to complete a workweek.[4] (Tr. 360). However, he

---

4. *See supra*, note 3.

also stated Plaintiff could maintain regular attendance, be punctual, interact with supervisors, follow work rules, function independently, and use judgment. *Id.*

The ALJ observed that Dr. Ivan's opinion that Plaintiff's mental illness over the last five years was "intermittent" was consistent with records of her mental health during that time period. (Tr. 27) (citing Tr. 357). She also afforded Dr. Ivan's opinion that anxiety limited her ability to complete a normal workweek little weight because "there [was] no treatment or other evidence that reasonably support[ed] this conclusion during the period herein under consideration." *Id.* The ALJ pointed out that from 2006 to 2007, Plaintiff's mental condition had improved. (Tr. 24) (citing Tr. 259-74). She noted the record indicated Plaintiff's symptoms were well controlled with medication. (Tr. 24) (citing Tr. 259-74). The ALJ noted records from March 2007 indicated Plaintiff was cooperative, had normal speech, full affect, and good attention and concentration. (Tr. 25) (citing Tr. 259-74). In conjunction, the ALJ observed there had been no psychiatric treatment records between June 5, 2007 and her October 14, 2009 visit to the emergency room. (Tr. 25) (citing Tr. 313). The ALJ also pointed out there were no further psychological or psychiatric treatment records through Plaintiff's date last insured, December 31, 2011. (Tr. 26).

The record supports the ALJ's finding that Dr. Ivan's opinion that Plaintiff's "anxiety limited her ability to complete a normal workweek" was entitled to little evidentiary weight. (Tr. 27). Dr. Ivan's October 17, 2013 statement that Plaintiff had "poor concentration" (Tr. 357) and a "poor response to treatment" (Tr. 357) contradicts his treatment notes opining that Plaintiff had good concentration and was responding well to treatment (Tr. 259, 261, 263, 265, 267, 269, 271). As the record reveals contradictions between portions of Dr. Ivan's October 17, 2013 opinion and his treatment notes, the ALJ reasonably discounted those that were inconsistent. *See Norris*, F. App'x at 439 (citing *Ealy*, 594 F.3d at 514) (ALJ may discount a treating source opinion when it

is inconsistent with the record); *see also* 20 C.F.R. § 404.1527(c)(4) (an ALJ may discount a medical source opinion if it is inconsistent with other substantial evidence). This comports with the ALJ's duty to consider the evidence and determine the weight each opinion deserves. *See* 20 C.F.R. § 404.1527(e) (a non-exhaustive list of issues reserved to the Commissioner). Therefore, in light of the complete record, the undersigned finds the weight the ALJ assigned to Dr. Ivan's opinion is supported by substantial evidence and the ALJ satisfied the reasons-giving requirement.

### *Consideration of the Reviewing Physicians' Opinions*

Lastly, Plaintiff alleges the ALJ's RFC assessment conflicts with the opinions of the state agency psychologists. (Doc. 15, at 19). Plaintiff argues the ALJ's RFC fails to account for her moderate restrictions in: 1) concentration and pace or, 2) completing a normal workday and week. *Id.* at 20. The Commissioner responds that the ALJ's RFC finding was consistent with the opinions of the state agency psychologists. (Doc. 18, at 16). According to the Commissioner, the ALJ expressly acknowledged Plaintiff's difficulties in social functioning, in maintaining concentration, persistence, and pace and incorporated those difficulties by adopting an RFC limiting Plaintiff to simple, routine, repetitive tasks, requiring only simple decisions, not at a production rate pace, and did not involve piece-rate or assembly line work. *Id.*

State agency consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Social Security Act." *Miller*, 811 F.3d at 834 (citing SSR 96-6p, 1996 WL 374180, at *2); 20 C.F.R. § 404.1527(e)(2)(i). The regulations require ALJs to "'consider findings of state agency medical and psychological consultants,' but ALJs 'are not bound by any findings made by state agency medical or psychological consultants.'" 20 C.F.R. § 404.1527(e)(2)(i). Nonetheless, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances,

be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823-24 (S.D. Ohio 2011).

As the regulations state, "[a claimant's RFC] is the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is "an assessment of the claimant's remaining capacity for work" and is "meant to describe the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from–though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). In formulating a claimant's RFC, an ALJ "is required to incorporate only those limitations he accepts as credible." *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 336 (6th Cir. 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). This is because "[t]he Social Security Act instructs that the ALJ–not a physician–ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010); *see Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 404.1546(c) (ALJ is responsible for determining your residual functional capacity).

Moreover, "[o]pinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3. *See, e.g.*, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 31-32 (6th Cir. 2009) (rejecting claimant's argument that it was "improper for the ALJ to rely on the state agency reports" over treating source reports); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651-52 (6th Cir. 2006) (en banc) (ALJ may properly adopt reviewing physician's opinion over treating source

opinion). However, "[O]pinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F. Supp. 2d at 823-24.

Dr. Tangeman and Dr. Zwissler concluded Plaintiff had moderate limitations in her ability to: 1) maintain concentration; 2) complete a normal workday; 3) interact with the general public; 4) respond to criticism from supervisors; 5) get along with coworkers; and 6) respond to changes in the work setting were all moderately limited. (Tr. 96-97, 108-10). However, both state agency psychologists concluded Plaintiff did not have any understanding and memory limitations. (Tr. 95, 108). They also concluded Plaintiff did not have any limitations in her ability to: 1) carry out detailed instructions; 2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) sustain an ordinary routine without special supervision; 4) work in coordination with or in proximity to others without being distracted by them; or 5) make simple work related decisions. (Tr. 95, 108).

The ALJ acknowledged these moderate limitations with social functioning, concentration, persistence, and pace. (Tr. 22). As a result, the ALJ incorporated those difficulties into an RFC finding limiting Plaintiff to simple, routine, repetitive tasks, requiring only simple work-related decisions, and not at a production rate pace. (Tr. 23). Additionally, the ALJ limited Plaintiff to no over the shoulder supervision and occasional interaction with coworkers and the general public. *Id.* She also noted that as recently as August 2014, Plaintiff had engaged in helping an elderly couple under the table several hours a day, five days a week. (Tr. 26) (citing Tr. 433); (Tr. 27).

The ALJ's RFC limiting Plaintiff to simple, routine, repetitive tasks, requiring only simple work related decisions, and not at a production rate pace comports with the moderate limitations the agency psychiatrists placed on Plaintiff's abilities in concentration and pace. Furthermore,

Plaintiff's RFC comports with the findings of both state agency psychiatrists that she did not have any understanding or memory limitations, and that she had no limitations in her ability to carry out detailed instructions, make simple work related decisions, perform activities within a schedule, and sustain an ordinary routine. The ALJ reasonably accommodated Plaintiff's limitations as described by the state agency psychologists as neither placed any concrete functional limitations on Plaintiff's abilities when performing simple, repetitive, or routine tasks. (Tr. 95-96) (Dr. Tangeman's opinion); (Tr. 108-09) (Dr. Zwissler's opinion). *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) (ALJ's limitation to simple, routine tasks was appropriate because no medical source placed concrete functional limitations on claimant's abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks).

Furthermore, the ALJ did not have to incorporate all of the findings of the state agency psychologists. Although Dr. Tangeman and Dr. Zwissler opined that Plaintiff had moderate limitations in her ability to complete a normal workday and workweek (Tr. 96, 108), Plaintiff contradicts their opinions in her statement to Dr. Ivan in August 2014, revealing that she had been working under the table. This conforms to the ALJ's duty to weigh opinions of state agency psychologists utilizing the same factors as treating physicians, which includes consistency. *See Douglas*, 832 F. Supp. 2d at 823-24; *see also* 20 C.F.R. § 404.1527(c)(4). The ALJ only incorporated only those limits she accepted as credible. *Casey*, 987 F.2d at 1235.

Because the ALJ accounted for the restrictions placed on Plaintiff's RFC by the state agency reviewing psychologists and reasonably discounted others, the undersigned finds the ALJ's evaluation of the state agency psychologists' opinions is supported by substantial evidence. The ALJ fulfilled her duty under the regulations to consider all of the evidence; the ALJ alone makes

the determination of a claimant's RFC. 20 C.F.R. § 404.1546(c); *see Coldiron*, 391 F. App'x at 439; *Nejat*, 359 F. App'x at 578.

In support of her argument, Plaintiff cites *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930-31 (E.D. Mich. 2005). In *Edwards*, the court held the ALJ's hypothetical posed to the VE limiting claimant to unskilled sedentary work was not adequate to accommodate claimant's moderate limitations of concentration, persistence, and pace. 383 F. Supp. 2d at 930. Plaintiff also cites *Green v. Comm'r of Soc. Sec.*, 2009 WL 2365557, at *10 (E.D. Mich.) (concerning the hypothetical question give to a VE at step five of the analysis). However, Plaintiff does not challenge any of the ALJ's hypotheticals in her brief and instead challenges the ALJ's evaluation and assessment of the reviewing physicians' opinions.[5] (Doc. 15, at 19).

Regardless, even if there is substantial evidence in the record to support an opposite conclusion, substantial evidence also exists to support the findings made by the ALJ, and thus, the Court will not overturn them. *Jones*, 336 F.3d at 477. "The findings of the Commissioner are not

_____

5. The *Edwards* holding has been criticized by courts in its own district. For example, in *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844-BC, 2010 WL 3905375, at *3 (E.D. Mich.), the court held that "decisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work." *See also Schalk v. Comm'r of Soc. Sec.*, 2011 WL 4406824, at *11 n.6, 7 (E.D. Mich.) ("[T]here is no brightline rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, [the court] must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC."), *adopted by* 2011 WL 4406332 (E.D. Mich.); *Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682, at *7 (E.D. Mich.), *adopted by* 2011 WL 2682892 (E.D. Mich.). Moreover, the Sixth Circuit has also held: "[c]ase law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is per se insufficient to convey moderate limitations in concentration, persistence, and pace." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016) (emphasis omitted). *See also Smith-Johnson*, 579 F. App'x at 436-37 (claimant's limitations in concentration, persistence, and pace were conveyed by the ALJ's hypothetical limitation to "simple, routine, and repetitive tasks" because claimant's doctor "did not place any concrete functional limitations on her abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks"). The undersigned finds the Sixth Circuit's reasoning persuasive here and declines to adopt the reasoning advanced by *Edwards*.

subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . this is so because there is a zone of choice within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence, and therefore the Commissioner's decision is affirmed.

s/James R. Knepp, II
United States Magistrate Judge